## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KATHERINE RAYSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 21 C 508 |
| | ) | |
| ADVOCATE CONDELL MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter is before the Court on Defendant Advocate Condell Medical Center's ("Advocate") Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the following reasons, the Motion is denied.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

### The Parties

Advocate Aurora Health[1] is the largest healthcare system in Illinois. It is a not-for-profit organization that includes hospitals, outpatient centers, immediate care clinics, surgical centers, laboratories, imaging centers, and physical therapy locations. Plaintiff Katherine Raysby worked as an OB Tech in Advocate's New Life Center from May 2006 until her termination on April 6, 2019. In 2019, her direct supervisor was the manager of the department, Sara Marcy. The assistant manager, Allison Hughes, also supervised Raysby. Francine Schaefer worked as a Team Member Relations Consultant and was involved with Raysby's termination in a Human Resources ("HR") capacity.

### Advocate's Attendance & Disciplinary Policies

Advocate has a "no fault" attendance policy, meaning that anytime an employee (also known as a "team member") calls off for a scheduled shift that occurrence will constitute an unexcused absence regardless of the reason the employee calls off. The attendance policy defines unscheduled absences as "any absence from scheduled work that has not been approved in advance by a team member's leader." Dkt. # 31, ¶ 11. Leaders such as Marcy are responsible for addressing team member attendance issues in a timely manner as they are identified and for the documentation of actions taken. "Each set of circumstances are to be evaluated on its merits, taking into consideration

---

[1] While Advocate's Local Rule 56.1 statement of facts states that "Advocate" is the largest healthcare system in Illinois, the Court presumes counsel was referring to "Advocate Aurora Health," and not Advocate Condell Medical Center specifically. Dkt. # 31, ¶ 4.

the impact that the absences have on department operations, along with the timing, frequency and the total number of absences and/or tardiness." Dkt. # 39, ¶ 4.

Advocate maintains a corrective action policy which utilizes a progressive discipline system that provides for a Level 1 Warning, Level 2 Warning, and Level 3 Final Warning. Levels can be skipped for serious or repeated violations. The corrective action policy provides that an employee's employment may be terminated if the employee violates a rule within 12 months of receiving a Level 3 Final Warning. Corrective action may be issued for a pattern of unscheduled absences that adversely impacts departmental operations, as well as for "a pattern of unscheduled absences that occur on a team member's scheduled weekend or holiday to work." Dkt. # 31, ¶ 12.

### Raysby's History of Corrective Actions

Raysby was placed on a performance improvement plan from September 2016 through February 2017. Several performance deficiencies were listed in the performance improvement plan, none of which were related to attendance. The plan stated that if additional performance issues are later identified that are related to the performance issues already identified within 12 months of the date of the performance deficiency notice, then termination may occur. Raysby completed the performance improvement plan successfully.

On November 7, 2018, Raysby was issued a Level 1 corrective action notice for allegedly threatening a housekeeping staff member, although Raysby denies that she ever threatened the employee. The corrective action notice does not mention

attendance. And on December 28, 2018, Raysby was issued a Level 3 corrective action notice/final warning for allegedly not stocking her department. The corrective action notice does not mention attendance.

### *Family and Medical Leave Act ("FMLA") Procedures*

MetLife is Advocate's third-party administrator for employee FMLA leave. MetLife, rather than Advocate employees, handles FMLA requests and administration of the leave. If an employee is on intermittent FMLA leave, they need to report each individual absence within two business days of the absence to MetLife. Even though other third parties can call in and report absences on an employee's behalf, it is ultimately the team member's responsibility to certify the absences. If taking continuous leave, employees do not need to report each individual absence. In reviewing whether a team member's medical certification is requesting continuous or intermittent leave to care for a family member, MetLife does not look to the nature of the family member's medical condition but rather the team member's need to be there for the family member. It is not uncommon for an employee to request intermittent leave to care for a loved one who may be continuously incapacitated or ill. Raysby previously took FMLA leaves in 2014 and 2018 without any issue or consequence.

### *Raysby's 2018–2019 FMLA Leave*

Raysby's mother was admitted to Advocate on December 30, 2018, where she remained for 31 days. On December 31, 2018, Raysby called MetLife seeking FMLA leave to take care of her mother. She spoke with Austin Miller, who worked in

4

MetLife's FMLA department as a case manager and was responsible for taking intake and service calls and managing FMLA claims. Raysby requested intermittent leave, which was approved.

On her December 31 phone call with Miller, Miller told Raysby she needed to report to MetLife each of the days that she was absent as part of her leave. Raysby understood that she needed to call or fax in the dates of her shifts that she was not able to work in order to certify them as part of her FMLA leave. Miller informed Raysby she could report her absences either by giving MetLife a call or using the MetLife My Benefits Web Portal to report intermittent absences. Raysby reported an absence on December 31, 2018, to be counted as part of her FMLA leave, and Miller documented that absence as a certified FMLA absence in MetLife's system.

Raysby used intermittent FMLA leave to be excused from several shifts in January. On the days she needed to use the intermittent leave, she always contacted her charge nurse (the nurse in charge of scheduling) ahead of time and also contacted MetLife.

Raysby's mother was discharged from the hospital to hospice care on February 2, 2019. Raysby was scheduled to work that day but accompanied her mother home to hospice instead. Before leaving the hospital, Raysby placed her mother's discharge papers in Marcy's mailbox and spoke with her charge nurse. In her declaration, Raysby says that she told her charge nurse that she was taking her mother to hospice and to

remove her from the schedule.[2]  Marcy was not present when Raysby dropped off the discharge papers, and Raysby admits she did not speak with Marcy about her absences or the paperwork.

Raysby did not work her scheduled shifts on February 2 and February 3, 2019, and did not report those absences to MetLife.  When asked why she did not certify the February 2nd and 3rd absences with MetLife, Raysby stated she probably forgot because there was so much going on at the time.  Raysby also says that she didn't think it was "absolutely necessary" to contact MetLife because "I had let [the charge nurse] know that she should take me off the schedule, and therefore that I would be off continuously."  Dkt. # 31-2, Raysby Dec., ¶ 11.

It was Marcy's understanding that Raysby did not mark February 2nd and 3rd as FMLA days, so she counted those days as unexcused absences and later called Schaefer in HR to discuss Raysby's attendance.  Schaefer testified that she spoke to Marcy and there was a concern that the absences were on Super Bowl weekend.  Marcy informed Schaefer that Raysby was on intermittent FMLA leave due to her mother's illness but that she did not certify the two absences with MetLife.  Recognizing Raysby was going through a difficult time, Schaefer advised Marcy to coach Raysby on her attendance at that point rather than issue the next step in Advocate's progressive discipline policy.

---

[2] Advocate objects to this statement of fact because it was not testified to at Raysby's deposition.  This dispute is addressed in detail below.

Raysby's mother passed away on February 13, 2019, and Raysby's FMLA leave closed at that time. Raysby admits that no one at Advocate ever said anything negative or disparaging about her taking FMLA leave. She also testified that her supervisors, charge nurse, and coworkers were empathetic and compassionate toward her while her mother was sick, although she later clarified that Marcy was not among those that showed her compassion.

### *Raysby's February 2019 Performance Evaluation*

On or around February 26, 2019, Raysby had a performance evaluation meeting with Hughes (the assistant manager). During the meeting, Hughes told Raysby "I know you have been out on FMLA because of your mother, but you need to be careful about your attendance." Dkt. # 39, ¶ 13. Raysby received an overall rating of "Meets Expectations" and received a merit raise thereafter. The manager's comments stated, "Kathy also needs to work on her call ins, as she called in 9 times in 2018." *Id*. ¶ 14. While the performance review, issued after the February 2019 unexcused absences, does not mention the February absences or any attendance problems in 2019, the review period on the evaluation is listed as "01/01/2018 – 12/31/2018."

### *March Absences*

Raysby was scheduled to work on March 16, 2019, and March 21, 2019, but did not work those shifts. According to Raysby, she called her charge nurse on the 14th or 15th and said she was experiencing vertigo, which in the past had been known to last for a week. She asked the charge nurse if she could schedule her on a different day.

7

Raysby says the charge nurse called her back later that day and told her she could take her off the schedule for the 16th and the 21st and put her on for the 23rd and 24th instead. Her charge nurse did not indicate Raysby would be marked with an unscheduled absence for the 16th or the 21st, and Raysby had never been marked with an unscheduled absence when she switched days in the past. Raysby testified that on numerous occasions, the charge nurse would ask her to switch days with another technician that needed the day off and, conversely, when Raysby would advise her charge nurse she needed a day off, the charge nurse would find another technician to switch with her.

The charge nurse denies that she "pre-approved" Raysby's absences on the 16th and 21st and, after reviewing the March 2019 timecards, stated she spoke with Raysby about these missed shifts *after* Raysby called in and missed the shifts. Raysby denies this and is "absolutely certain" she spoke with the charge nurse prior to March 16th.

The charge nurse updates schedules and maintains staff timecards, and the managers and HR review the timecards as they appear in the system. Raysby's timecards included an unscheduled paid time off ("UPTO") pay code for March 16th and 21st. UPTO is a designation that a charge nurse would enter into the system for when an employee calls off sick from a scheduled shift with no prior approval for the absence. Based on their review of the timecards, Marcy and Schaefer determined the March 16th and 21st absences were unexcused. According to Marcy, if an employee missed her scheduled shift due to sickness and then after missing her shifts gets assigned

to different shifts, that would constitute an unexcused absence. Raysby admits that her understanding of Advocate's attendance policy was that if an employee missed a scheduled shift without pre-approval that absence would constitute an unexcused absence even if that employee then picked up another shift.

### Raysby's Termination

Raysby was terminated on April 6, 2019.[3] Her termination form lists four unexcused absences: February 2, 2019, February 3, 2019, March 16, 2019, and March 21, 2019. It further notes Raysby was already on a Level 3 Final Warning. The termination notice states, "[u]nscheduled absences has [*sic*] an impact on the unit as it places a significant burden on your co-workers who have to pick up your workload. Absenteeism also negatively impacts our ability to provide service to our patients." Dkt. #23-1. When Raysby contacted HR to challenge her termination, Schaefer directed her to pursue the conflict resolution process.

Raysby submitted a request for conflict resolution. In the paperwork and at her deposition, Raysby stated there was a personality conflict between her and Marcy, and she believed that personality conflict impacted the decision to terminate her. Raysby testified that she felt a "conflict or tension" in her relationship with Marcy "[p]retty much from the beginning of [Marcy's] hire time" and for the next two years that Raysby

---

[3] April 6th is Raysby's birthday. In her declaration, Raysby says even though she worked April 4th with Marcy, Marcy came in on her day off to terminate Raysby, preventing Raysby from attending the birthday party she saw her coworkers planning for her. Dkt. #32-1, ¶ 18.

worked with her. Dkt. # 31, ¶ 16. Raysby felt Marcy was overly strict and "[j]ust picking, picking at me all the time." *Id.* at ¶ 17.

Raysby also stated in the conflict resolution paperwork that "I was scheduled to work on March 16th and the 21st, but unfortunately became ill myself with Vertigo. The Charge Nurse, Karla, contacted me to switch my missed shifts and I worked March 23rd and March 24th instead." *Id.* at ¶ 80. Based upon this statement, Schaefer had no reason to question the March dates as being deemed unexcused absences. Schaefer testified that she would have investigated Raysby's claim that the charge nurse pre-approved the two March 2019 absences if Raysby had brought the issue up through the conflict resolution process. Again, Raysby is adamant that she contacted her charge nurse to switch shifts and not the other way around.

After submitting the conflict resolution paperwork, Raysby and Schaefer spoke on the phone a few times and set up a phone meeting for Raysby, Schaefer, and Marcy. The meeting was later cancelled. Raysby left Schaefer a voicemail attempting to reschedule the meeting but did not return Schaefer's attempt to reschedule. The conflict resolution process was never completed.

Schaefer testified that for a manager to place an employee on a Level 3 warning or terminate an employee, the first step would be to reach out to her. Schaefer acknowledged that Raysby successfully completed her 2016–2017 performance improvement plan and confirmed that it was not, in any way, related to the decision to terminate Raysby. Schaefer acknowledged that, had the February 2 and 3, 2019

absences not counted against Raysby, Raysby would likely have just been counseled instead of terminated after her March 2019 unexcused absences.

Raysby brought claims for FLSA interference and retaliation against Advocate. Advocate now moves for summary judgment on both counts.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

11

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

## **DISCUSSION**

The FMLA permits an eligible employee to take up to 12 weeks of leave per year "to care for . . . [a] parent [with] a serious health condition." 29 U.S.C. § 2612(a)(1)(C). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. *Id.* § 2615(a)(1). Nor may an employer retaliate against an employee for exercising FMLA rights. *See id.* § 2615(a)(2) (prohibiting "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter"); *id.* § 2615(b) (making it unlawful for any employer to discharge or discriminate against anyone for exercising rights under the FMLA); *see also Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) ("We have construed [Sections 2615(a)(2) and (b) ] to create a cause of action for retaliation."). An interference claim requires proof that the employer denied

12

the employee FMLA rights to which she was entitled; a retaliation claim requires proof of discriminatory or retaliatory intent. *Goelzer v. Sheboygan County, Wis.,* 604 F.3d 987, 995 (7th Cir. 2010); *Kauffman,* 426 F.3d at 884–85.

## I.     FMLA Interference Claim

"To prevail on an FMLA-interference theory, the plaintiff employee must prove that: '(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.'" *Pagel v. TIN Inc.*, 695 F.3d 622, 626–27 (7th Cir. 2012) (quoting *Makowski v. SmithAmundsen LLC,* 662 F.3d 818, 825 (7th Cir. 2011)).

In its opening brief, Advocate argues Raysby's FMLA interference claim fails because she cannot establish the fifth element. Raysby, however, accuses Advocate of conflating the fourth and fifth elements because Advocate focuses solely on notice for and interference with Raysby's intermittent leave. According to Raysby, she sought continuous—not intermittent—leave for the duration of the time that her mother would be on hospice care, beginning February 2, 2019. Raysby contends her "notice to Defendant of her mother being on hospice and her request for Defendant to take her off the schedule triggered a new kind of leave from her intermittent leave: Continuous leave." Dkt. # 30, at 13.

In making this argument, Raysby appears to implicitly concede that Advocate did not interfere with or deny her intermittent leave FMLA benefits. Rather, it is her

13

position that she was denied continuous leave. Raysby claims her mother's "natural progression with her illness . . . should have put Defendant on notice that Plaintiff's need for leave converted from intermittent leave to continuous leave." *Id.* at 11.

Advocate strenuously objects to this "new theory of the case" and Raysby's claim that she told her charge nurse to remove her from the schedule. Advocate urges the Court to disregard this portion of Raysby's declaration under the "sham affidavit" rule because it allegedly contradicts her prior deposition testimony. The sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)); *see also United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) ("The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised.") (internal quotation marks omitted). The rule must be applied with "great care" because "summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Every correction of memory failure or variation in a witness's testimony does not require that an affidavit be excluded as sham. *See id.* at 571–72. Rather, "an affidavit can be excluded as a sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Id.* at 572 (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996)). Where the change is plausible or the party offers a suitable

explanation for the change, the changes in testimony go to the witness' credibility rather than admissibility. *Funds in the Amount of $271,080*, 816 F.3d at 907.

Having reviewed the declaration and the relevant deposition excerpts, the Court does not believe that the declaration directly contradicts any deposition testimony. The sham affidavit doctrine applies "upon a threshold determination of a 'contradiction,' which only exists when the statements are 'inherently inconsistent'" and the discrepancies are "incredible and unexplained." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (quoting *Com. Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001)). Those circumstances are not present here. While Raysby could have answered the questions more thoroughly, her attempt to supplement those answers is not so suspect as to render the declaration inadmissible. The issue is one of credibility.

But, assuming the truth of Raysby's assertion for purposes of summary judgment, is this enough to create a genuine issue of material fact as to whether Raysby gave sufficient notice of her need to switch to continuous FMLA leave? Advocate says no, because Raysby admits she did not follow Advocate's procedural requirements. We disagree.

Raysby relies on *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006), where the Seventh Circuit held that an employer should have been on notice of an employee's need for FMLA leave based on the observable progression of his cancer. But the Seventh Circuit later distinguished *Burnett* from cases such as Raysby's, noting that

"*Burnett* involved FMLA leave for an employee's *own* medical needs, not for the purpose of caring for an ill family member." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 827 (7th Cir. 2012). In *Nicholson*, it was the employee's parents who suffered from serious medical conditions, so the need for FMLA "was not as obvious as it was in *Burnett*." *Id.* This makes sense because, as the regulations recognize, continuous leave to care for a sick family member may not be needed when there are others available to assist the employee with caring for the family member. *See* 29 C.F.R. § 825.124(c) ("An employee's intermittent leave . . . to care for a family member . . . includes not only a situation where the condition of the family member . . . itself is intermittent, but also where the employee is only needed intermittently—such as where other care is normally available, or care responsibilities are shared with another member of the family or a third party.").

*Nicholson*, however, is also distinguishable because in that case while the employee notified her supervisor of her father's serious diagnosis, she did not communicate that she needed time off to care for him. 690 F.3d at 827. "At most, she commented on the *possibility* that she might in the future have a need to take time off to care for her father." *Id.* The employee herself said the matter was "left open-ended" because of uncertainties surrounding her father's need for care. *Id.* Here, Raysby

asserts she notified her charge nurse that she needed to be taken off the schedule because of her mother's discharge to hospice care.[4]

Nevertheless, "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances," and an employee "also may be required by an employer's policy to contact a specific individual." 29 C.F.R. §§ 825.302(d), 825.303(d). "Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.*

Raysby admits that Advocate employees—either managers or HR representatives—never handle FMLA request or administer FMLA leave; rather, they defer to MetLife. Raysby understood that MetLife would handle the request, administration, and procedure for her intermittent FMLA leave, and knew she needed to report absences to MetLife—not just her supervisor. Raysby did not report the February 2nd and 3rd absences to MetLife and therefore failed to comply with Advocate's internal leave policy for intermittent FMLA leave.

Even so, we find that Raysby's FMLA interference claim should proceed to trial for two reasons. First, Raysby contends her situation constituted an "unusual circumstance" such that notice to MetLife should have been excused, although she does

---

[4] The Court must accept Raysby's version of the facts at this stage in the proceedings. *See Turner v. Health Care Service Corp.*, 2009 WL 1210624, at *16 (N.D. Ill. 2009).

not cite any case law in support of this contention. Raysby argues her mother's discharge to hospice care, "to put it bluntly, meant that [Raysby] was going home to watch her mother die," was something that "would greatly diminish the attention and decision-making abilities of even the strongest minds." Dkt. # 30, at 13. While the FMLA does not define "unusual circumstances," the FMLA regulations associate "unusual circumstances" with communication issues such as the employee's inability to reach a supervisor or designated employee. *See id.* Other courts have deemed circumstances "unusual" when the medical condition or illness prevents compliance with the normal procedures, *see Howard v. VT Halter Marine, Inc.*, 2011 WL 2414672 (S.D. Miss. 2011), the employee cannot access a phone, *see Flores v. Murphy Co.*, 2014 WL 584553, at *6 (D. Or. 2014), the employer's policies conflict with the law, *see Millea v. Metro-North R.R.*, 658 F.3d 154, 161–62 (2d Cir. 2011), or the employer has misled the employee is some way regarding the proper procedures, *see Uselton v. CSX Transp., Inc.*, 2014 WL 4388272, at *5 (N.D. Ohio 2014). None of these circumstances are present in this case. However, we cannot say that as a matter of law Raysby's situation is not an instance where the regulations required Advocate to make an exception to enforcement of its call-in procedures. On the present record, whether Raysby's situation constituted, as she claims, an "unusual circumstance" is a question of fact, not law.

Second, as Raysby frames it, we are dealing with the issue of notice of the need for *continuous* leave, which Raysby claims she sought and was denied. As noted above,

whether Raysby told her charge nurse to take her off the schedule is a credibility issue that cannot be decided by the Court. Further complicating the matter is the fact that neither Advocate's nor MetLife's FMLA policy is included in the record before the Court. As a result, the Court is left in the dark at to what procedures need to be followed if an employee wishes to switch from intermittent to continuous leave based on a change in circumstance, and what sort of notice is required. Advocate's attendance policy does not discuss FMLA leave procedures. Miller's deposition testimony does not address MetLife's continuous leave procedures, except to say that an employee does not need to report every absence if on continuous leave. It could be that Advocate's or MetLife's FMLA policy provides that a specific type of notice is required when changed circumstances will alter the duration of FMLA leave. We just don't know.

Because questions of fact exist as to whether Raysby provided sufficient notice, summary judgment on her FMLA interference claim is inappropriate.

## II. FMLA Retaliation Claim

"Retaliation claims under the FMLA . . . require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). To succeed on her retaliation claim, Raysby does not need to prove that "retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'"

*Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)). To make this showing, a plaintiff can rely on direct or circumstantial evidence, including "suspicious timing" and "ambiguous statements from which a retaliatory intent can be drawn." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

Raysby was engaging in statutorily protected activity by utilizing FMLA leave and experienced an adverse action when she was terminated from her position. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307–08 (7th Cir. 2022). "Therefore, we need only determine whether the record established by [Raysby] supports the inference that [she] established a causal connection between the two events." *See Cracco*, 559 F.3d at 633. In assessing the causal connection, the Court "consider[s] the evidence as a whole and ask[s] whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017).

In assessing the parties' arguments, "the Court is mindful that it 'does not sit as a super-personnel department, second-guessing an employer's business decision' as to whether someone should be fired." *Rayford v. La Petite Acad., Inc.*, 2021 WL 2311968, at *6 (N.D. Ill. 2021) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012)). But it is equally mindful that "the persuasiveness of the defendant's explanation is normally for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Culver*, 416 F.3d at 546 (internal quotation marks omitted). Here, after

20

construing the evidence in the light most favorable to Raysby, the Court is "hard-pressed to say that a finder of fact would be '*compelled* to credit [Advocate's] case on this point.'" *Rayford*, 2021 WL 2311968, at \*6 (quoting *Culver*, 416 F.3d at 546).

Raysby's termination papers indicated she was terminated for unscheduled absences which were not part of her approved FMLA leave on February 2 and 3, 2019, and March 16 and 21, 2019. It was further noted Raysby was already on a Level 3 Final Warning. The termination notice stated, "[u]nscheduled absences has [*sic*] an impact on the unit as it places a significant burden on your co-workers who have to pick up your workload. Absenteeism also negatively impacts our ability to provide service to our patients." Dkt. # 23-1.

Advocate, for its part, contends there is no direct evidence showing that Advocate acted with a retaliatory animus because Raysby admits no one ever said anything disparaging about her need to take FMLA. Raysby testified that all of her coworkers and supervisors were particularly compassionate to her during that time—although she later clarified that Marcy was not among those that showed her compassion. Additionally, Schaefer testified that Raysby worked in a predominantly female unit and coworkers took FMLA leave often and without issue. Raysby herself took FMLA leave twice in the past without issue.

Advocate also argues there is no evidence of pretext because Advocate had a legitimate, non-discriminatory basis for Raysby's termination. Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie,

21

specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015)). Merely disagreeing with an employer's reasons does not meet this standard. *Tibbs v. Admin. Off. of the Illinois Cts.*, 860 F.3d 502, 506 (7th Cir. 2017). A plaintiff must point to "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate" the termination. *Carter v. Chi. State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015) (quoting *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 808 (7th Cir. 2014)). Where multiple reasons are given, the plaintiff faces a greater challenge. *Tibbs*, 860 F.3d at 506. Showing that just one reason was a pretext may not be enough. *Id.*

Raysby contends there is evidence that Advocate's basis for terminating her was pretextual because the March absences should not have counted against her. Advocate says the question of whether Raysby's charge nurse agreed to switch Raysby's shifts on March 16th and 21st doesn't present a material dispute for summary judgment because the undisputed evidence shows that Marcy and Schaefer—the ultimate decisionmakers—determined Raysby had unexcused absences on those dates based on their review of Raysby's timecards and the UPTO designation. Advocate cites the "honest belief rule," which provides that an employer may be entitled to summary judgment on a retaliation claim where, based on a mistaken belief, it terminated an employee for reasons unrelated to the employee's protected activities. *See, e.g.,*

*Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2012); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.").

Still, even if Marcy and Schaefer honestly believed Raysby's absences were unexcused, that Raysby's absences were "serious enough to warrant termination rather than lesser discipline was apparently a subjective decision of [Marcy's], and when an employer relies on subjective criteria, it leaves itself vulnerable to a factfinder's inference that its given reason for the decision was a pretext for an unlawful motive." *Rayford*, 2021 WL 2311968, at *7 (citing *Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 246 (7th Cir. 2009)).

Raysby also argues Advocate's failure to follow its own attendance policies is further evidence supporting her retaliation claim. Raysby asserts Marcy didn't address Raysby's alleged attendance issues in a timely manner, because prior to her termination, she was never told February 2nd and 3rd were counted as unexcused absences.[5] True, "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext," *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir.

---

[5] Raysby also says Advocate failed to follow its policies because Marcy did not provide her with notice of her right to utilize the conflict resolution process. This claim is belied by the termination notice, which specifically states, "[t]his Corrective Action may be eligible for Associate Conflict Resolution Program, Advocate System Policy # 90.013.013. Please consult with HR within 7 calendar days from the issuance of this notice to utilize this program." Dkt. # 23-1.

2005), but Raysby admits she was warned about her attendance at her February performance evaluation.

Raysby additionally claims the way Marcy handled her termination by terminating her on her birthday when her coworkers were planning on having a party, and her belief that Raysby was attempting to use FMLA leave so that she could party for the Super Bowl, further show Marcy's contempt for Raysby while attempting to use FMLA leave.

Finally, Raysby says Hughes' warning given during her February performance evaluation ("I know you have been out on FMLA because of your mother, but you need to be careful about your attendance") is vague and ambiguous and is direct evidence of animus towards Raysby's use of FMLA. Advocate correctly points out that, standing alone, such a comment is insufficient to show a retaliatory animus, particularly because Hughes was not involved in the decision to terminate Raysby. But, it's something to consider when viewing all the evidence as a whole.

In the Court's view, Raysby's retaliation claim must proceed to trial because factual questions preclude entry of summary judgment in Advocate's favor. Additionally, upon consideration of her interference claim, a reasonable jury could find that Raysby was entitled to FMLA leave on February 2nd and 3rd. If that's the case, a reasonable jury could also find that Raysby's exercise of her FMLA rights was "at least a key component" of Advocate's reason for terminating her. This is because if Raysby was entitled to be on FMLA leave on February 2nd or 3rd, her absence from work

because she was on that leave is a "key act" that Advocate labeled as in violation of its policies. *See Jordan v. Marsh USA, Inc.*, 2019 WL 5682834, at *7 (N.D. Ill. 2019) ("[A]n employer is not entitled to summary judgment where it based its motivation for terminating an employee, 'or at least a key component of it,' on a mistaken belief that the employee was ineligible for the FMLA's protections.'") (quoting *Burnett*, 472 F.3d at 482). If Raysby had not exercised her right to take leave—*i.e.*, if she had worked on those two days—then Advocate could not have found Raysby in violation of its policies on those two dates. And then, as Schaefer acknowledged, Raysby likely would have simply been counseled about her March absences rather than terminated.

Under the circumstances, there are disputed questions of material fact concerning whether Advocate would have terminated Raysby regardless of her request for and utilization of FMLA leave, which preclude summary judgment. Advocate's motion is denied.

### CONCLUSION

For the foregoing reasons, Advocate's Motion for Summary Judgment [21] is denied. Status hearing is set for 11/22/2022 at 10:20 a.m.

It is so ordered.

Dated: November 8, 2022

Charles P. Kocoras
United States District Judge